IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION



CASE NO.: 6:11-cv-1498-ORL-22DAB

DOUGLAS STONE, on
behalf of the United States of
America,

        Plaintiff/Relator,

vs.

HOSPICE OF THE COMFORTER,
INC., a Florida corporation,

        Defendant.

FILED UNDER SEAL

JURY TRIAL DEMANDED

## QUI TAM COMPLAINT

Plaintiff, DOUGLAS STONE, brings this *Qui Tam* action in the name of the United States of America, by and through his undersigned attorneys, Morgan & Morgan, P.A., and alleges as follows:

### SUMMARY INTRODUCTION

1.    This is an action by qui tam Relator DOUGLAS STONE ("STONE"). on behalf of the United States of America, against Defendant, HOSPICE OF THE COMFORTER, INC. ("HOTCI") to recover penalties and damages arising from mischarges and false statements made by HOTICI to receive payment for improperly enrolling patients for hospice care benefits who were not properly qualified as being terminally ill pursuant to 42 U.S.C. § 1395. It is the estimated that the false claims to the federal government described herein are likely in the aggregate range of $11,000,000.00.



## PARTIES

2. Relator STONE, is a citizen of the State of Florida, Orange County.

3. HOTCI is a corporation organized and existing under the laws of the State of Florida and having its principal place of business in Seminole County, Florida.

4. STONE was employed by HOTCI as its Vice President of Finance from 1990 until he was suspended on or about October 25, 2010 for protesting the false claims made by HOTCI as described hereinafter. STONE has direct, independent, and personal knowledge of the facts set forth herein, unless otherwise specified herein.

## JURISDICTION & VENUE

5. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

6. This Court maintains subject matter jurisdiction over this action pursuant 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

7. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because HOTCI transacts business in this district and did so at all times relevant to this complaint; and, as averred below, (iii) HOTCI committed acts proscribed by 28 U.S.C. § 3729—acts giving rise to this action—within this district.

8. At the time of filing this complaint, STONE served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

9. STONE has complied with all other conditions precedent to bringing this action.

10. STONE is the original source of, and has direct and independent knowledge of, all information disclosed herein on which the allegations herein are based, and has voluntarily provided such information to the Government at the time of filing this action under seal.

## INTRODUCTION

11. The Medicare hospice benefit ("Hospice") covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six (6) months or less, as determined by their physician. Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified Hospice patients may receive skilled nursing services, pain medication, physical and continuous therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of terminal illness. Qualified beneficiaries who elect Hospice agree to forego curative treatment for their terminal condition.

12. Medicare is a federally funded health insurance program primarily for the elderly. Medicare was created in 1965 in Title XVIII of the Social Security Act. Medicare Part A covers hospitals, home health, nursing facilities, and Hospice care.

13. From HOTCI's inception in February 27, 2008, it has received a major portion of its funding from the United States government through provisions of the federal Medicare Program. The amount of funds received by HOTCI are governed under regulations promulgated by the Centers for Medicare and Medicaid Services ("CMS"), which provide payments to Hospices caring for Medicare-qualified patients.

14. Medicaid is the federally funded health program for certain people and families with low income and resources. It is a means-tested program that is jointly funded by the state and federal governments, and is managed by the states. Medicaid is the largest source of funding for medical and health-related services for people with limited income in the Unites States. Medicaid was created on July 30, 1965, through Title XIX of the Social Security Act. Each state

administers its own Medicaid program while the CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards.

15. Through Medicare and/or Medicaid, the United States reimburses Hospice providers for the services provided to qualified beneficiaries on a per diem rate for each day a qualified beneficiary is enrolled. Medicare and/or Medicaid make a daily payment, regardless of the amount of services provided on a given day, and even on days when services are not provided. The daily payment rates are intended to cover costs that Hospice providers incur in furnishing services identified in patients' care plans for patients who have been determined by their physicians to be suffering a terminal illness.

16. Payments are made according to a fee schedule that has four base payments amounts for the four different categories of care: Routine Home Care ("RHC"), Continuous Home Care ("CHC"), Inpatient Respite Care ("IRC"), and General Inpatient Care ("GIC"). The four categories are distinguished by the location and intensity of the services provided and the base payments for each category reflect variation in expected input cost differences. Unless a Hospice provides CHC, IRC, or GIC on any given day, it is paid at the RHC rate. For any given patient, the type of care can vary throughout the Hospice stay as the patient's needs change.

17. In order to receive Hospice care, a patient's doctor and the medical director of a Hospice facility are required to certify that the patient is terminally ill and likely has less than six (6) months to live. The patient signs a statement choosing Hospice care rather than curative treatments. If the patient lives longer than six months, he or she can continue to receive Hospice care as long as a doctor recertifies that the patient is still terminally ill with a life expectancy of less than six months.

18. A Hospice agency is required to be certified by Medicare in order to receive Medicare payments. Under Medicare statutes and regulations, it must establish a plan of care for

each patient based on that patient's specific needs. The services may include physician services, nursing care, medical equipment and supplies, medications for symptom control and pain relief, home health aide and homemaker services, physical and occupational therapy, speech therapy, social work services, dietary counseling, grief and loss counseling for the patient and family, spiritual counseling, and short-term in-patient care.

19. Applicable provisions of federal regulations at 42 C.F.R. Part 418 and other federal regulations and statutes provide for payment to Hospice agencies. These payments are based upon the level of care required by the Hospice patient.

20. In the current fiscal year (2011) Medicare pays $146.63 per day for RHC, $855.79 per day for CHC, $151.67 per day for IRC, and $652.27 per day for GIC.

21. HOTCI has engaged in a plan or scheme to enlist individuals to elect Hospice care who were not in fact terminally ill as defined in Section 1814(a)(7) of the Social Security Act (42 U.S.C. § 1395) to increase HOTCI's number of enrollees in order to gain payment from Medicare and its fiscal intermediary in a manner which is false or fraudulent. HOTCI has charged the federal government for Hospice benefits when no Hospice care was truly indicated for enrollees who were not terminally ill and not eligible for Hospice benefits. HOTCI accomplished this scheme by improperly and fraudulently enrolling such patients for Hospice election when they were not, in fact, terminally ill or eligible for Hospice benefits. These actions have caused the federal government to pay for Hospice benefits that were falsely and fraudulently inflated and submitted by HOTCI.

## SPECIFIC CONDUCT OF HOTCI

22. During the first quarter of 2010 HOTCI was chosen for a "Medicare Probe" by Palmetto GBA, its Third Party Administrator, requiring HOTCI to respond to 40 Additional Development Requests (ADRs) for review. This probe was part of a wide, sweeping initiative

encompassing most of the Hospices processed by this carrier. The threshold for further inquiry was a denial rate of 15%. HOTCI's rate of denial was 18%. Failure to stay below the 15% denial rate pushed HOTCI into a second level of higher scrutiny.

23. Immediately following this initial probe, Bonnie Hannah, then Vice President of Nursing, and currently a Board Member of HOTCI, initiated a Discharge Committee. The Committee was made up of a cross section of clinicians. They met weekly and reviewed 4 to 5 patient cases per week. Over the fourth quarter of 2009 they discharged over 50 cases with the designation "No longer terminally ill". Essentially Bonnie Hannah suspected that a larger Medicare investigation was coming after the initial probe, and the nursing staff was discharging as many inappropriate patients as possible before a full Medicare Audit commenced. For the approximately 50 patients discharged in 2009, however, HOTCI did not refund any amounts to Medicare, although each of these patients was determined by the Discharge Committee to not be medically eligible for Hospice benefits.

24. Ironically a number of patients in this group were "Friends of Bob". (HOTCI's medical records system has a tag designated "FOB" for individuals or families who are personal friends of HOTCI's Chief Executive Officer, Robert "Bob" Wilson ("WILSON"). In some cases WILSON directly intervened, and insisted that the patients who were deemed "no longer terminally ill" by the Discharge Committee be readmitted and billed to Medicare.

25. The follow-on survey involved a much larger sampling of patient charts, up to 120 per month. The second full quarter of evaluations yielded an alarming *77% denial rate*. While this level of scrutiny typically lasts two quarters before it advances, Medicare skipped over the second quarter and advanced HOTCI to the last and final level of scrutiny before the possible implementation of sanctions. This next level of scrutiny required HOTCI to prepare for Palmetto approval a Comprehensive Action Plan (CAP), detailing how it would bring its

documentation and eligibility into compliance with Medicare standards. According to HOTCI's Director of Quality, Marty Brown, only 6% of the Hospices were so problematic in the initial probe to raise this level of scrutiny. Despite the alarming discovery of a 77% denial rate, however, HOTCI took no actions to refund to Medicare any amounts previously paid to HOTCI for these Hospice patients.

26. Historically, HOTCI has been on a very favorable PIP (Periodic Interim Payment) from Medicare. Other agencies reported that when they went to this level of review that they lost their PIP approval and they were required to submit individual claims for payment, greatly increasing the aging of their Accounts Receivable. Loss of PIP would require HOTCI to acquire at least $4,500,000.00 of additional working capital. With this in mind, STONE, as Vice President of Finance, notified the Board Treasurer/Chairman of HOTCI's Finance Committee, Jack Cadden, CPA in a brief email that HOTCI might experience a "highly negative cash flow event." STONE similarly advised HOTCI Compliance Officer Mitch Mikkonen that he should advise the Chairman of the Board that a highly negative compliance event was underway, and could get worse.

27. Marty Brown, HOTCI's Director of Quality Assurance, advised STONE that the increase in scrutiny arose due to the fact that the Local Coverage Determinations, which are the precise instructions from the Medicare Contractor that delineate which patients can be covered based on their specific medical conditions, had changed very little. However, she indicated that the enforcement of those already existing rules had now been strengthened. Marty Brown further indicated that HOTCI nurses had been instructed in Orientation that was perfectly acceptable to cut and paste the patient information month after month in HOTCI's computer system, simply repeating the patient's chart from the prior month. This was common practice for the many Alzheimer's patients, for example, who had a terminal diagnosis but were not actively dying. In

7

reality, HOTCI not able to document that a patient was declining towards death, as the patient was essentially a stable chronic care patient who had nonetheless obtained a terminal diagnosis.

28.     WILSON was highly incensed that STONE had communicated directly with HOTCI's Treasurer regarding the potential need to immediately raise additional capital. STONE immediately verbally informed Mitch Mikkonnen, HOTCI's Compliance Officer, and Lynn Wollin, HOTCI's Human Resources Director that the flow of information about compliance problems to Board Members and Officers was clearly protected employment-related action under both federal and state laws. Upon notice of the CAP demand from Palmetto, WILSON immediately demanded weekly meetings to discuss the Medicare crisis. However, thereafter WILSON scheduled only one further meeting and then again continued to ignore the serious Medicare issue.

29.     From April 1st to July 23, 2010, HOTCI experienced more than $1,000,000.00 in denied claims from Medicare. Approximately 50% of this was directly related to patients who were not medically eligible for Hospice benefits. STONE was alarmed, however, that HOTCI's clinical department's Utilization Review Committee was finding an extremely large numbers of patients who were now being designated "no longer terminally ill." By July 23, 2010, HOTCI had discharged over 133 patients that, after a review of their charts, HOTCI's own physicians and nurses concluded that they did not in fact meet Medicare's billing criteria for Hospice care. At this point STONE became concerned about the possibility that HOTCI had submitted numerous Medicare claims that could be considered "False Claims." HOTCI had willingly discharged up to 20% of its patients because they did not meet Medicare billing criteria for Hospice care. Once HOTCI clinical staff belatedly began to apply the correct Medicare criteria to its admission process, its admissions immediately dropped 10%. Once again, however,

HOTCI took no action to refund to Medicare any amounts which they had previously collected from patients who were not medically eligible for Hospice reimbursement.

30. On July 23, 2010 the Friday before HOTCI's quarterly Board Meeting on the following Monday, STONE sent WILSON an email titled "One last thought before the Board Meeting--Highly Confidential" which contained an article entitled "False Claims Act Implications" authored by Charles I. Artz Esq. The article detailed a *Qui Tam* decision that had sweeping consequences. STONE highlighted in various colors the sections that concerned him, including one which stated:

> **"If a provider fails to inform himself of all legal requirements for payment including CMS and carrier guidelines, the provider may act in reckless disregard or in deliberate ignorance of those requirements, establishing liability under the False Claims Act."**

STONE also highlighted in red the treble damage penalties and the civil fines for each false claim.

31. Upon receipt of STONE's e-mail attaching the Qui Tam article, WILSON dismissed STONE'S concerns and derided him for being concerned about the issue.

32. On July 26, 2010, STONE presented HOTCI's Board of Directors with a Finance Report that showed a huge decline in HOTIC's patient census and over $1,000,000.00 of Medicare denials to date. Furthermore, STONE presented financial projections which concluded that, as a result of losing over $6,000,000.00 in annual revenue due to the Medicare denials and resulting census decline, HOTCI would experience substantial losses in the third quarter and would probably experience lay-offs for the first time in the history of the organization. STONE also informed the Board of the "worst-case" scenario, that follow-on scrutiny by any number of Federal agencies was possible and that those agencies would have the ability to look back as far

as 10 years to ascertain whether HOTCI had been overpaid. To emphasize the risk, STONE included a reference to a "Black Swan" event, one which has a low probability, but which can have a profound effect.

33.   On July 27, 2010, WILSON visited STONE's office and admonished him for disseminating negative information to the Board of Directors. WILSON informed STONE that all "prognostications" were strictly his responsibility and that all further presentations would be "upbeat and positive". He was exceptionally angry.

34.   In a meeting with WILSON on or about Sept 17, 2010, STONE discussed HOTCI's financial results for August 2010. STONE informed WILSON that HOTCI had taken a write-down of over $900,000.00 thus far for Medicare denials, because HOTCI had been denied over $1,200,000.00 and expected to win back only $300,000.00 upon appeal. When WILSON demanded an explanation for such a low probability of success upon appeal, STONE informed him that Dr. Sherry Brooks, HOTCI's Associate Medical Director, and a number of qualified nurses had been reviewing patient charts for the purposes of evaluating appeals and that, in the majority of cases in the words of Dr. Brooks, "We don't have a leg to stand on." WILSON asked how this was possible and STONE replied that many of HOTCI's patients are chronically ill but stable and should not have been billed under Hospice guidelines. In addition, many lacked physician documentation; many had documentation which had been electronically cut-and-pasted month after month by HOTCI nurses, and which did not show the required degree of physical decline mandated by Medicare.

35.   STONE was frustrated that WILSON did not appear to understand the gravity of HOTCI's potential over-billing to Medicare. STONE thus appealed directly to the other members of HOTCI's Board of Directors. STONE had conversations informally with a number of HOTCI's Board Members expressing his concern that the Compliance issue was not being

addressed, and that HOTCI faced substantial risk. STONE documented this in a memo to a Board of Directors, Jill Schwartz dated Sept. 29th, 2010. Schwartz was not just a dedicated member of our Board, but was also a lawyer with a physician husband and a number of physician clients. STONE was hoping that this issue would be more aggressively dealt with at the Board Level and titled his memo to Schwartz "The Nuclear Option".

36. WILSON had direct benefit from the patient census growth of HOTCI in many previous years, as he was paid a "patient day" bonus amounting to substantially more than a million dollars over the past few years, as a quarterly commission *paid based on the billable census of the organization.* WILSON's base salary $120,000.00 per year, yet his patient day bonuses exceeded $200,000.00 per year. In 2009 the long-time Chairman of the Board of HOTCI retired. Peggy Thomas, a local business woman replaced him, and she endeavored to cap the patient day bonus paid to WILSON. WILSON retaliated and had her removed from the position.

37. At approximately the same time as his e-mail to Jill Schwartz, STONE met with Board member Bob Watson, who indicated that he too felt that HOTCI was ill-served by WILSON's apparent desire to ignore the Medicare overbilling issue.

38. In the summer of 2010 HOTCI had an external consultant review its compliance program. The consultant offered his services to do a comprehensive external patient review. HOTCI declined the offer. Wilson insisted that the compliance consultant not generate a written report, and structured the consultation fee to exclude payment for any written record of the consultant's conclusions, to ensure that any report to a selected sub-set of management would only be oral.

39. On October 8, 2010, STONE had a conversation with Chairman of the Board Jo Simonini. STONE informed her that he had met with a qualified healthcare attorney and that he

was going to recommend to WILSON that HOTCI further investigate, via audit, under attorney-client privilege, the possibility that it had over-billed Medicare. She was in favor of the proposal.

40. At HOTCI's Quarterly Compliance meeting on Oct 11, 2011 STONE presented an analysis of the billing for the now 150 discharged patients in 2010 who no longer met billing criteria for Medicare reimbursement. STONE also looked back at those patients who were discharged in 2009 and presented to the committee a detailed list of patients and their total billing since admission. Most of the patients for 2010 had already received at least one Medicare denial, many had been on HOTCI's service for over 2 years and some had been on service for over 5 years. (Medicare guidelines expect that most patients will be on hospice service less than 6 months). Some of HOTCI's patients have been billed over $250,000.00 during the length of their stay on service. STONE advised the group that it was impossible to believe that HOTCI had not over-billed Medicare and that the worst-case scenario of the overbilling amounted to **$11,000,000, together with treble damages and penalties.** STONE pushed hard in this meeting and quite publicly in front of a large group of witnesses for an audit of a percentage of the denied patients to see if they had in fact met the met the Medicare requirements from the inception of treatment. Surprisingly WILSON was in attendance at this meeting for the first time in STONE's history of employment. He immediately decreed that no such audit would take place.

41. Later in the day on Oct 11th, STONE drafted an email to Mitch Mikkonen, HOTCI's Compliance Officer, which he sent on Oct. 12th. STONE expressed in writing to HOTCI's compliance officer his further disagreement with the decision not to look into the possibility that HOTCI had over-billed Medicare.

42. On October 11th Bill Avery and STONE met with the majority of the Board of Directors at their invitation for about two and one half hours in the evening. Many of the board

members including but not limited to Bonnie Hannah, Mark Hillis, Peggy Thomas, Dwan Andrews, Jill Schwartz and Craig Pearlman had repeatedly requested information and expressed concerns about the state of HOTCI's Medicare billing requirements. STONE provided to them the same article that he had provided to WILSON on False Claims as well as a copy of the 1999 OIG directive as published in the Federal Register that mandates Board Involvement in issues of Compliance. STONE additionally provided these Board members with the same analysis that HOTCI may have committed over $11,000,000.00 in overbilling to the federal government.

43.     On Tuesday, October 19, 2010, Bill Avery, another Vice President of HOTCI, at the urging of Hospice of the Comforter Board Member Bob Watson, met with WILSON to advise that WILSON had lost the faith and trust of the Senior Leadership of the Organization.

44.     Later that day, WILSON requested that STONE visit his office to review the Quarterly financial results. WILSON informed STONE that he would be out of town for the remainder of the week but that he wanted to review STONE's Board presentation on Monday morning before the Board meeting. STONE was told to make his presentation "upbeat, positive and optimistic," despite losing $1,200,000.00 during the quarter.

45.     On October 25th 2010 WILSON and Bob Watson came to STONE's office and informed him that he had been suspended. Vice President Bill Avery was similarly suspended. No reason was given for the suspensions. The regular Quarterly Board Meeting that was scheduled for this day possibly to discuss the "no-confidence" vote in WILSON had been canceled by WILSON the week before.

46.     Later on the night of October 25, 2010 STONE met with the same group of Board Members. He informed them of his suspension, and provided them with all of the e-mails which documented his ongoing concern with the overbilling to Medicare.

47. On Thursday October 21st Bill Avery and STONE met with Burnell Hunter, another Board Member. STONE provided Hunter with the same Medicare materials, and had the same basic discussion about his concerns regarding compliance issues.

48. During the course of STONE's tenure with HOTCI, WILSON advocated a position of admitting *any* patient who arguably may have met the Medicare admission criteria, with the stated intention of re-evaluating the patient after 90 days' of observation. But the Medicare guidelines are quite specific. Section 1814(a)(7) of the Social Security Act (42 U.S.C. § 1395) does *not* provide for a 90 day "wait-and-see" look. Instead, it requires a written certification that the patient's medical prognosis is that their life expectancy is six months or less if the terminal illness runs its normal course, together with specific clinical findings and other documentation to support a life expectancy of six months or less. Stated otherwise, WILSON adopted a relaxed admission standard to maximize the patient census of HOTCI, and, in the process, his own income.

49. To further the problem, once an inappropriate patient was admitted to HOTCI they were essentially on the service forever. Until Bonnie Hannah initiated the Utilization Review Committee (originally known as the Discharge Committee) of her own accord in 2009 there was no effective periodic review at HOTCI to determine if the patient was truly Medicare eligible on an ongoing basis. This Committee authorized massive discharges of patients in the spring of 2010 as a result of the heightened Medicare scrutiny and an increased awareness of Medicare's actual criteria for coverage.

50. Further encouraging the problem was the fact that HOTCI Physicians' compensation was always aligned to prevent decertification. They were paid as contractors, based on each visit to the patient. They were assigned a geographic region. If a Physician had decertified a patient, his or her patient load would drop and as a direct and proximate result their

take home pay would drop. The physicians were essentially allowed to determine their own compensation. Some physicians routinely billed at the highest possible billing code, while others always billed at the lowest code. In the spring of 2008, STONE did a study of the physician billing patterns and recommended some standardization of physician visit billing. This recommendation was ignored.

51. Compliance in HOTCI was an afterthought in the organization. The Chief Compliance Officer was a pastor, and had no training whatsoever in compliance, and no operational authority. The CEO never attended compliance meetings, and the Board did not have a subcommittee for compliance. The Compliance Committee identified the problem of inappropriate patients years ago. WILSON refused to take any corrective action.

52. Mitchell Mikkonen, HOTCI's Executive Vice President, member of the Board of Directors, and Chief Compliance Officer, was outraged over the overbillings to Medicare and repeatedly demanded Medicare compliance. His efforts in this regard resulted in his pay being cut by 40%, his removal from HOTCI leadership positions, and being moved from an executive office he had occupied for three years into a small conference room. Mikkonen detailed the retaliatory action to which he was subjected in a letter dated May 16, 2011.

53. Similarly, HOTCI Bill Avery joined with STONE in raising the alarm over the substantial false billings to Medicare, and demanded reform and immediate compliance with Medicare regulations. As a result, he was immediately suspended by HOTCI and it was announced to the entire staff and volunteers that he was "under investigation" by HOTCI. Avery detailed the retaliatory action which was taken against him in a letter dated December 17, 2011.

## COUNT I
### Violations of the False Claims Act

54. As described in this Qui Tam Complaint, Defendant, by and through its officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

55. Defendant authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

56. The United States Government has been damaged as a result of Defendant's violations of the False Claims Act.

57. STONE requests a jury trial on all issues so triable.

WHEREFORE, Relator STONE, on behalf of himself and the United States Government, prays:

(i) that this Court enter a judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the False Claims Act;

(ii) that this Court enter a judgment against Defendant for a civil penalty of $10,000 for each of Defendant's violations of the False Claims Act;

(iii) that Relator STONE recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(iv) that Relator STONE be awarded all reasonable attorneys' fees in bringing this action;

(v) that in the event the United States Government proceeds with this action, Relator STONE be awarded an amount for bringing this action of 25% of the proceeds of the action;

(vi) that in the event the United States Government does not proceed with this action, Relator STONE be awarded an amount for bringing this action of 30% of the proceeds of the action;

(vii) that Relator STONE be awarded prejudgment interest;

(viii) that a trial by jury be held on all issues so triable; and

(ix) that Relator STONE and the United States of America receive all relief to which either or both may be entitled at law or in equity.

## DEMAND FOR TRIAL BY JURY

STONE demands trial by jury on all issues so triable.

        **MORGAN & MORGAN, P.A.**
        20 North Orange Avenue, Suite 1600
        P.O. Box 4979
        Orlando, FL 32802
        Telephone: 407.849.2972
        Facsimile: 407.418.2048

By: _____
        David S. Oliver
        Florida Bar No. 521922
        Doliver@BusinessTrialGroup.com

Dated: September 12, 2011